IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DOROTHY WINDSOR | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:10-cv-635 (AJT/TCB) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner, Social Security | ) |
| Administration | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), Dorothy Windsor ("plaintiff") seeks judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Commissioner" or "defendant") denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA" or "the Act"), 42 U.S.C. §§ 401-433. The record has been filed and the case is now before the Court on cross-motions for summary judgment (Doc. No. 12 and 14). The dispositive issue is whether the Commissioner's decision is supported by substantial evidence.

In her Motion for Summary Judgment, plaintiff contends that the Commissioner's decision is not supported by substantial evidence and should therefore be reversed because: (1) the determinations of the administrative law judge ("ALJ") fail to specify a particular degree of hand usage impairment to support his determination that the plaintiff has residual functional capacity to perform her past relevant work; (2) the ALJ and the Appeals Council failed to give appropriate weight to the treating physician's opinion and applied an incorrect legal standard; and (3) the ALJ determined that the Plaintiff was "not

1

entirely credible" based on an incorrect legal standard. In his Motion for Summary Judgment, the Commissioner contends that the decision to deny plaintiff's benefits should be affirmed because substantial evidence exists in the record to support the Commissioner's decision that plaintiff was not disabled within the meaning of the Act, and because the Commissioner applied the correct legal standards in reaching his decision.

Based on this Court's review of the entire administrative record, the Court concludes that the plaintiff has established her entitlement to disability insurance benefits and the decision of the Commissioner denying those benefits is not supported by substantial evidence.

## I. PROCEEDINGS

In August 2006, plaintiff filed an application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act, alleging she had been disabled since June 30, 2004 due to lupus and heart problems. On October 13, 2006, the Commissioner determined that based on a review of plaintiff's health problems, she did not qualify for DIB. On November 14, 2006, plaintiff filed a request for reconsideration, and on January 26, 2007, the Commissioner determined that plaintiff's claim was properly denied. On February 7, 2007, plaintiff requested a hearing before an administrative law judge ("ALJ") to review the Commissioner's determination. In an affidavit dated October 26, 2007, the claimant amended her alleged onset date to November 3, 2005. A hearing was held before an ALJ on December 20, 2007.

On January 10, 2008, the ALJ issued a decision denying plaintiff's claim. The ALJ found that although the plaintiff suffered from a severe case of systemic lupus

erythematosus ("SLE"),[1] and a heart condition, she was not prevented from working because of those conditions and she was therefore not entitled to receive disability benefits.

On January 10, 2008, Plaintiff requested that the Appeals Council review the decision of the ALJ and also consider her application for benefits further, particularly in light of additional information submitted by her treating physician, Dr. Rosalia Lomeo ("Dr. Lomeo"). Over two years later, on April 7, 2010, the Appeals Council denied Plaintiff's request for review and the Commissioner's decision became final. On June 8, 2010, plaintiff timely filed this action for judicial review pursuant to 42 U.S.C. § 405(g).

## II. FACTS OF RECORD

The administrative record before the Court reflects the following:

A. Plaintiff's Personal Background

Born on November 3, 1955, plaintiff was fifty years old as of November 3, 2005, the date she alleged she became unable to work. She has a high school education. From 1986 to 1998, she worked as a cashier and as an on-the-line service waitress; and from 1998 to 2004, she was employed as a cafeteria worker at a school. She has not engaged in gainful work activity since November 3, 2005.

B. The Medical Evidence

   i. *Plaintiff's treating physician*

---

[1] Systemic Lupus Erythematosus (SLE) is a chronic, multisystem inflammatory autoimmune disorder with common manifestations including arthralgias, polyarthritis, vascular headaches, skin rashes, recurrent pleurisy, pericarditis, generalized adenopahty, fevers, malaise, anemia, chronic infections, renal and hematological involvement. The Merck Manual of Diagnosis and Therapy 426-30 (Mark H. Beers, M.C. & Robert Berkow, M.D., eds.) (17th ed. 1999).

Dr. Lomeo of the Arthritis and Pain Center in Fredericksburg, Virginia has been Plaintiff's treating rheumatologist since 1999. On June 25, 2007, Dr. Lomeo completed a Systemic Lupus Erythematosus Questionnaire for the purposes of evaluating plaintiff's administrative claim.[2] As reflected in her answers to the Questionnaire, Dr. Lomeo saw the plaintiff on a monthly basis since 1999; and based on physical examinations and blood testing/sedimentation rates, Dr. Lomeo determined that the plaintiff suffers from SLE. Plaintiff's signs and symptoms indicative of SLE include fatigue, difficulty remembering, muscle/joint weakness, pain, thrombocytopenia (low platelets), anemia, arthritis, blood count abnormalities, immunologic disorder, and antinuclear antibodies, malar "butterfly" rash, and photosensitivity or skin rash in reaction to sunlight exposure. Dr. Lomeo also confirmed that the plaintiff has a "medically determinable condition which could reasonably be expected to produce" plaintiff's inability to engage in certain physical activities specified in the Questionaire [3] and that the plaintiff "[t]o a reasonable degree of medical probability, has the degree of functional impairment caused by the claimant's condition existed [sic] since 06/15/2004."[4] R. at 371.

---

[2] The Questionnaire appears to have been created specifically for the administrative proceedings and consists primarily of questions to be answered by checking a yes or no box.

[3] The form included the following statement: "Your patient states that during a week she experiences 'flare ups' of her symptoms which results in the following:
- Can only sit for one hour before needing to get up and walk for 5-10 minutes.
- Can stand for 2 hours before needing to sit down or lay down for 30-45 minutes
- Work no more than 3 hours in an 8-hour day due to the need to frequently rest."
The Questionnaire then asked: "[d]oes your patient have a medically determinable condition which could reasonably be expected to produce these limitations." Dr. Lomeo checked the box "yes."

[4] Also part of the administrative record are Dr. Lomeo's records from plaintiff's visits dated July 7, 2003 to October 23, 2007, which reflect a variety of complaints and

4

Dr. Lomeo is the only physician that has treated plaintiff for SLE, and thus plaintiff did not submit any other reports from other treating physicians specifically addressing her SLE and its symptoms. Plaintiff submitted records of her hospitalization from July 27, 2006 to August 3, 2006, when she was diagnosed with thrombocytopenia (low platelet count) and an E. Coli UTI infection. Plaintiff has also submitted records of her visits to her treating cardiologist, Dr. Martyak, and other doctors she visited in relation to her heart issues, including Dr. Bernstein, and Dr. Thrasher.[5]

---

ailments, including when Dr. Lomeo had the plaintiff rushed to the hospital on July 27, 2006. These references include the following:
- November 21, 2005: "hairloss is not as bad. She is tolerating her meds... She feels that she is having a flare." She records minimal synovitis in plaintiff's hands and wrists. R. at 383.
- July 27, 2006: Dr. Lomeo records that plaintiff "is very sick. I am worried that she has an infection and may have thrombocytopenia. I called her daughter who is coming. I also called an ambulance to take her to the ER." R. at 380
- March 26, 2007: Dr. Lomeo noted that she "is still exhibiting hand pain and swelling" and noted mild synovitis in her hands and wrists. R. at 374.
- April 25, 2007: Dr. Lomeo noted that plaintiff "is not doing well... She is having hand pain and swelling. She is having fatigue" and noted mild synovities in her hands and wrists. R. at 373.
- May 24, 2007: Dr. Lomeo noted that plaintiff "is doing better on Imuran... She is still exhibiting hand swelling and experiencing fatigue" and noted mild synovitis in her hands and wrists. R. at 372.

[5] These medical records reveal a history of myocardial infarction, percutaneous transluminal coronary angioplasty which resulted in a placement of stent in 1999. Plaintiff continues to be monitored for her heart problems and does appear to continue to have some issues associated with a left atrial enlargement, moderate aortic stenosis and moderate to severe aortic insufficiency with moderate mitral regurgitation. Plaintiff's treatment for her heart problems, however, appears to be effective, and on appeal, she relies primarily on her limitations caused by SLE in support of her claim to DIB. Plaintiff's treating physician, Dr. Lomeo, also opined that her primary diagnosis is lupus; and for these reasons, the Court has considered the plaintiff's claim for DIB based on her SLE. Given the Court's ruling, the Court does not consider the ALJ's determinations with respect to plaintiff's heart condition except insofar as they relate to his decision to assign only "little weight" to Dr. Lomeo's opinions, as discussed below, and his finding that plaintiff's complaints are "not entirely credible."

5

On November 24, 2008, after the ALJ denied plaintiff's application for disability benefits, the plaintiff submitted to the Appeals Council additional evidence from Dr. Lomeo.[6] This additional evidence expanded upon the evidence then in the record concerning plaintiff's condition. In this additional evidence, Dr. Lomeo stated that she diagnosed plaintiff with Lupus in 1999 based on a variety of tests and findings. These included (1) arthritis as the result of inflammation throughout her fingers and the associated swelling of the joints in her hands; (2) a positive Antinuclear Antibody lab test, (3) positive double-stranded DNA testing, a result very specific to lupus and indicative of a more severe disease; and (4) abnormal levels of C3 and C4 Complement, which are proteins that become activated when lupus is activated, and thus, these levels indicate the marked severity of plaintiff's SLE. Based on these conditions and test results, Dr. Lomeo explained that Plaintiff's SLE is more active, more severe, and more complicated than many other SLE sufferers. Dr. Lomeo's also stated that plaintiff's condition grew more severe over time and that she had to prescribe stronger medications for the plaintiff's condition, causing Dr. Lomeo to finally prescribe a form of chemotherapy, after plaintiff's "Lupus flare" caused endocarditis, an inflammation of the heart valve.[7] R. at 460.

With respect to her physical limitations, Dr. Lomeo explained that plaintiff's condition causes her to be constantly fatigued as if "[s]he feels like she has pneumonia

---

[6] This evidence consisted of a transcript of an oral examination under oath by plaintiff's counsel.

[7] Dr. Lomeo initially prescribed Plaquenil, followed by Methotrexate, which are described as common, fairly mild drugs used for treating lupus. In May or July of 2006, as plaintiff's condition grew more severe and she experienced more discomfort, Dr. Lomeo prescribed Imuran and then in late 2007, Cytoxin.

6

every day." R. at 460. She further explained that plaintiff's condition is cyclical, with plaintiff having "good days," described as days on which she feels less pain in her hands and back and less fatigue, but probably not "weeks that she is better." R. at 465. For these reasons, Dr. Lomeo would not doubt the chronic severity and disabling nature of plaintiff's condition even if plaintiff were able from time to time to do some of the activities she described, such as tending to a vegetable garden or a flower bed, doing laundry, ironing clothes or doing household cleaning chores.[8] Overall, Dr. Lomeo opined that the plaintiff could not resume her daily work as a cafeteria worker, opining that "It was much too hard for [plaintiff] to work at Courtland High School, making sandwiches. That was too much hand work, too much standing." R. at 463.

ii.  *The evaluations of state agency medical consultants*

For the purposes of evaluating whether plaintiff had "residual functional capacity," that is, whether the plaintiff had the ability to engage in normal daily activities, after taking into account her limitations, plaintiff's medical records were reviewed by two state agency medical consultants, Dr. Luc Vinh and Dr. William Amos. On October 13, 2006, Dr. Luc Vinh concluded that the plaintiff can perform "adls" [activities of daily living] with limitations attributed to hand pain and fatigue." R. at 339. He also concluded that the treatment of her various medical issues "has been essentially routine and conservative in nature... The medical records reveal that the medications have been relatively effective in controlling her symptoms." R. at 339. He also found that plaintiff's statements regarding her pain and fatigue, resulting in limitations in standing,

---

[8] Dr. Lomeo opined that "[s]he may do some of those things, but I am sure she does not do them all day. I am sure she may do a little bit, maybe 10 minutes a time and take rests. There is no way that she could do all of that everyday," R. at 463.

7

walking, lifting, carrying, bending, sitting, climbing, stooping and kneeling are "partially credible." He did not physically examine the plaintiff but nevertheless concluded that she can occasionally lift and/or carry 20 pounds, she can frequently lift/and/or carry 10 pounds, she can stand and/or walk for a total of about 6 hours in an 8-hour workday, and can sit (with normal breaks) for a total of about 6 hours in an 8-hour workday.[9]

On January 25, 2007, Dr. William Amos concluded that "the medical evidence establishes a medically determinable impairment of coronary artery disease and myocardial infarction (heart issues), lupus, obesity, hypertension, anemia, and disorders of the back." R. at 346. With respect to plaintiff's ability to engage in physical activities, Dr. Amos noted that the plaintiff stated that "she cares for personal needs, does cooking and light chores, shops when she feels up to it, attends church and does crafts. She avoids driving as she may have a dizzy spell and she paces herself due to easy fatigue and discomfort. She can lift 10 pounds and be on her feet for less than an hour." R. at 346. He also concluded that plaintiff "has documented medical impairments which would be expected to cause symptoms and limitations described by the plaintiff." R. at 346. He, like Dr. Vinh, did not conduct a physical examination of the plaintiff, but nevertheless, also concluded that plaintiff can occasionally lift and/or carry 20 pounds, frequently lift/and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday. Dr. Amos also concluded that "the objective medical and other evidence does not show impairment severity which would be expected to cause the degree of limitation described by the plaintiff or that would prevent all work as alleged." R. at 346. He, therefore,

---

[9] These findings are reflected in checked boxes of the form report completed by Dr. Vinh. *See* R. at 334.

8

found plaintiff's statements as to her physical limitations to be only "partially credible." R. at 347.

C. Plaintiff's Testimony Before the ALJ

At the administrative hearing on December 20, 2007, the plaintiff testified as to her condition and her physical limitations as follows: Since November 2005, she has been unable to work because of fatigue and achiness in her back, legs, and hands. The severity of her symptoms fluctuated daily and she did not know how she would feel the next day. On a scale of 0 to 10, 0 being no pain and 10 being severe pain, plaintiff estimated that her pain was in the 8 category and sometimes went higher. She had not found much that relieves the pain; and on a permanent basis, she does not take pain medication because she takes medication for lupus.

To keep her household running, she has to keep the house clean, including vacuuming and cleaning the bathrooms, although on the days her fingers cannot bend she will not clean the house. She does some of the household cooking, and on the days her hands ache severely, she can still prepare a salad for herself if she has to. She is able to take care of her personal hygiene requirements; and does not use a cane or any other device to assist her with walking. Plaintiff's daughter or husband take her grocery shopping. She drives approximately two to three times a week to pick up medication. She does some crafts, like flower arrangements, takes care of some indoor plants, goes to church when she feels she is able to, and socializes with friends and neighbors but mostly by telephone.

She can comfortably lift a gallon of milk and can maybe lift up to 20 pounds, but she could not lift that much weight all day. Plaintiff estimated that she had problems

continually standing for periods longer than an hour and had problems continually sitting for periods longer than about one to one and a half hours. She can walk for approximately 5 minutes. Her hands had "gotten so where I can't hardly use them" because they "ache, they swell" so that she can hardly bend them at times. R. at 24. On some days it is difficult for her to open up a can of soda or a jar.

### D. Other Information Submitted to the Agency

Cleo McGuire ("McGuire"), who has known the plaintiff for thirty-five years, wrote a letter explaining the effects of SLE that she has observed in plaintiff. McGuire notes that plaintiff "now struggles with the simplest task at home, such as bending, grasping objects and walking. She doesn't complain, but I know she has tremendous pain in her joints and she spends a portion of her days in bed due to her condition." R. at 131.

Teresa Harding, plaintiff's supervisor at the high school cafeteria where plaintiff worked, stated that plaintiff was a pleasant, hardworking, and dependable worker. However, in the last years plaintiff worked, she "noticed [plaintiff's] health was starting to decline" and plaintiff had to "miss[ ] some time from work due to her face swelling due to lupus." R. at 132. In the final year of employment, "she missed a lot of time from work due to her health problems with lupus." R. at 132.

Plaintiff's daughter, Marlene Windsor ("Marlene"), also submitted a letter for the record. In the letter, Marlene describes her mother's growing struggle with SLE. She notes that "lupus makes [plaintiff's] feet and finger joint have spams where they pop out of place for a few minutes" causing her great pain. Although plaintiff had taken great pride in her housework in the past, she now "has a hard time with house cleaning and laundry" because it "takes her three days to dust and vacuum because in the middle of

house cleaning [she] has spells of getting weak, sweating, dizzy and faint." R. at 133.
Plaintiff cannot travel in a car for long periods of time because it causes her pain, she
takes two naps on a regular basis and "stays exhausted throughout the day." R. at 134.

E. The ALJ'S Decision

The ALJ issued his decision on January 10, 2008, in which he denied plaintiff's
application for a period of disability and disability insurance benefits. In his written
decision, the ALJ acknowledged that his determination of plaintiff's entitlements was
governed by the five-step sequential evaluation process adopted by The Social Security
Administration ("SSA") for that purpose. *See* 20 C.F.R. § 404.1520.[10] As to step one,
the ALJ determined that plaintiff has not engaged in substantial gainful activity since her
amended onset date of November 3, 2005. As to step two, the ALJ determined that
plaintiff had severe impairments – SLE and a heart condition; but as to step three, the
ALJ concluded that her impairments did not meet or equal the listed impairments in
Appendix 1 to Subpart P of the Administrative Regulations and that through the date of
his decision on January 10, 2008, plaintiff had the residual functional capacity to perform
a range of light work. The ALJ did acknowledge that due to plaintiff's severe

---

[10] That process requires the Commissioner to consider, in order, the following: (1) whether claimant is engaged is substantial gainful activity ("SGA") since the alleged onset date; (2) whether claimant has a medically determinable impairment that is severe; (3) whether claimant has an impairment that meets or equals the requirements of a listed impairment in Appendix 1 to Subpart P of the Administrative Regulations; (4) whether claimant's residual functional capacity ("RFC"), a determination of the level of work a claimant can perform with her impairments, allows her to return to her past relevant work; and (5) if not, whether there are jobs that claimant can perform based on her RFC, age, education, and work experience. *See* 20 C.F.R. 404.1520. If the claimant meets the criteria of step three or four, the claimant has established a prima facie case of disability. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner to prove the final step of the analysis -- that claimant has the capacity to perform alternative jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520.

impairments and associated pain, plaintiff's residual functional capacity to perform light work was limited to occasional climbing, balancing, stooping, crouching and crawling, moderate exposure to hazards, and "non-continuous" use of her hands. The ALJ did not further articulate the exact limitations on plaintiff's use of her hands other than "non-continuous." Building on his determinations, the ALJ determined as to step four that through January 10, 2008, plaintiff's past relevant work as a waitress and cafeteria attendant did not require the performance of work-related activities precluded by her residual functional capacity and that plaintiff was, therefore, not disabled. In reaching this determination, the ALJ found that the plaintiff was "not entirely credible" and also assigned "very little weight" to the opinions of plaintiff's treating physician, Dr. Lomeo because, in his view, Dr. Lomeo's conclusions were inconsistent with the medical record and plaintiff's admitted activities of daily living. R. at 47.

On April 7, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision. In denying her request, the Appeals Council only stated that it "found no reason under our rules to review the Administrative Law Judge's decision." R. at 1.

### III. STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to considering whether the ALJ's findings are supported by substantial evidence and whether the correct law was applied. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). Substantial evidence is "more than a mere scintilla," but "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In assessing the ALJ's final determination, the Court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its]

judgment for that of the agency. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (quoting *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001)). At the same time, the Court "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Thomas v. Celebrezze*, 331 F.2d 541, 542 (4th Cir. 1964). In determining whether substantial evidence supports the Commissioner's decision, the Court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). Additionally, the ALJ's findings of fact are not binding if reached through the application of improper standards or misapplication of the law. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987); *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980).

It is also well-settled that an ALJ should not substitute his own untrained medical opinion for that of a medical professional. *Wilson v. Heckler*, 743 F.2d 218, 221 (4th Cir. 1984). Moreover, while all medical opinions, regardless of their source, should be reviewed together with the rest of the relevant evidence, more weight should be given to opinions from a treating source because those medical professionals are more able to provide a detailed, longitudinal picture of a claimant's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *See* 20 C.F.R. § 404.1527.

When a medical source is a treating physician, and that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record, [the Commissioner] will give it controlling weight." *Id*; *see also Coffman*, 829 F.2d at 517 ("[The treating physician] rule requires that the opinion of a claimant's treating physician be given great weight and may be disregarded only if there is persuasive contradictory evidence."). However, the ALJ is not required to give a treating source opinion controlling weight and should give a treating source opinion significantly less weight where it "is not supported by clinical evidence or if it inconsistent with other substantial evidence." *Craig*, 76 F.3d at 590. The Commissioner must, however, "always give good reasons" for the weight accorded to a treating source's opinion. 20 C.F.R. § 404.1527. The Commissioner must also explain the weight he gives to the opinions of agency doctors, which are evaluated using the same factors used for other medical sources. *Id*.

## IV. ANALYSIS

A person is disabled for purposes of DIB if the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a). In this case, there is no dispute that the plaintiff suffers from a significant impairment and that she has not engaged in substantial gainful employment since the alleged onset of that impairment, November 3, 2005. The only disputed issue is whether the plaintiff's residual functional capacity allows her to

return to her past relevant work and if not, whether her RFC allows her to perform available jobs within the economy in light of her age, education and work experience.

Based on the entire record, including the supplemental evidence submitted and accepted into the record by the Appeals Council, the Court finds that there is not substantial evidence in the record to support the Commissioner's denial of DIB to the plaintiff. *See Wilkins v. Secretary*, 953 F.2d 93, 96 (4th Cir. 1991) (finding that when the Appeals Council incorporated new evidence into the record, the district court must review the record as a whole including the new evidence). In reaching this conclusion, the Court finds that the ALJ failed to give appropriate weight to the opinions of plaintiff's treating physician, Dr. Lomeo, and that the medical records the ALJ cites do not support his findings regarding plaintiff's RFC and do not support his conclusion that plaintiff is capable of returning to her past relevant work.

First, there is nothing in the record that would justify assigning "very little weight" to Dr. Lomeo's opinions, as the ALJ did in his decision. Dr. Lomeo explained in detail the clinical and laboratory diagnostic techniques that allowed her to determine that the plaintiff is suffering from a more active and severe form of SLE, including the presence of double stranded DNA, the complement levels detected in plaintiff's blood work, and the presence of arthritis. Dr. Lomeo described how plaintiff's illness grew more serious and the increasing course of treatments that Dr. Lomeo had to prescribe. She provided a detailed, longitudinal picture of claimant's medical impairments, explaining that plaintiff's condition caused her to be constantly fatigued.

Nor was there anything in plaintiff's own testimony that undercut or called into question Dr. Lomeo's opinions, which acknowledged that the cyclical nature of

plaintiff's condition, as severe and disabling as it was, did allow for the types of intermittent, limited activities plaintiff described. Contrary to the conclusion of the ALJ, Dr. Lomeo's opinion is consistent with the medical records, objective test results and claimant's admitted activities of daily living. The only physicians that disagreed with Dr. Lomeo's evaluation of the plaintiff's limitations in any respect were Dr. Luc Vinh and Dr. William Amos, both of whom are non-treating physicians who never observed or examined the plaintiff and based their evaluation on the medical record alone, and even they concluded that the plaintiff is suffering from significant impairments as a result of her lupus.[11] Dr. Lomeo's opinions are well-supported by standard clinical and laboratory diagnostic techniques and are fully consistent with the other substantial evidence in the record. The Commissioner, therefore, should have afforded Dr. Lomeo's opinion dispositive and controlling weight. 20 C.F.R. § 404.1527; *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) ("[The treating physician] rule requires that the opinion of a claimant's treating physician be given great weight and may be disregarded only if there is persuasive contradictory evidence.").[12]

---

[11] Dr. Vinh concluded that plaintiff's activities of daily living are limited due to her "hand pain and fatigue" and Dr. Amos concluded that the medical evidence establishes a medically determinable impairment caused by, *inter alia*, lupus and disorders of the back.

[12] In his decision, the ALJ remarked that "whenever statements about the intensity, persistence, or functionality limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire record." R. at 45. The Court concludes that the plaintiff's subjective complaints are fully supported by objective medical evidence and the premise for the ALJ's assessment of plaintiff's credibility with respect to her limitations appears not to be supported in this record.

Once the appropriate weight is given to Dr. Lomeo's opinion, it is clear that the ALJ's decision that the plaintiff's RFC allows plaintiff to return to her past work is not supported by substantial evidence. As a cafeteria worker and waitress or order taker, plaintiff is required to reach and handle objects with her hands frequently and required to stand for long periods of time. *See* R. at 143, *Dictionary of Occupational Titles* (4th Ed. 1991) 311.677-014 and 311.677-018 (describing these roles as requiring someone to serve or bus food from counters, serve salads, vegetables, meat, and bread; ladle soups and sauces, scrubs, wipes and polishes counters, carry dishes, restocks supplies, including silverware, etc). Dr. Lomeo stated that the requirements on plaintiff's hands as a cafeteria attendant and the standing requirements associated with this job were "much too much" for plaintiff. R. at 463. Furthermore, Dr. Lomeo stated, consistent with plaintiff's testimony, that while the plaintiff may have "good days," she does not experience significant periods free from her disabilities, but rather feels greatly fatigued on a daily basis.[13]

Nor is there substantial evidence in the record to support the ALJ's determination that based on the medical records the "claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely credible." R. at 47.

---

[13] For example, plaintiff testified that while she may be able to fix a salad for herself on those days when her hands are swollen and she cannot bend her fingers, she has trouble opening soda cans and jars, responsibilities that are very likely to fall to a cafeteria worker or waitress. In fact, her hands have "gotten so where [she] can't hardly use them." R. at 24. Plaintiff's daughter wrote that plaintiff took at least two naps daily and still remained fatigued. Plaintiff's former supervisor at the cafeteria wrote that the last year of plaintiff's employment she had to miss a lot of work because her symptoms had grown more severe. Plaintiff testified that she was having great difficulty working as a cafeteria worker and had to take many breaks in between, felt pain in her hands and a great deal of fatigue. Plaintiff testified that even working as a substitute cafeteria worker on a part time basis exceeded her capacity. Plaintiff also opined that her job as a waitress "was a lot harder" than her job as a cafeteria worker. R. at 34.

After reviewing closely the ALJ's decision and the record, the Court finds that those portions of the medical records relied on by the ALJ are either for the most part irrelevant, as they pertain, not to plaintiff's SLE, but her stable heart condition or are isolated references to medical entries that suggest, at most, nothing other than that the plaintiff had experienced some temporary relief in some of her symptoms.[14] Upon consideration of the entire record, and affording Dr. Lomeo's opinion the weight it was entitled to receive, the Court concludes that the plaintiff has established that her RFC does not allow her to return to her past relevant work as a cafeteria worker or waitress.

Having determined that the record establishes that the plaintiff's residual functional capacity does not allow her to return to her past relevant work, the only remaining question is whether the record establishes that there is other work available in

---

[14] These entries relied on by the ALJ include the following:
- in September 2005, two months before the alleged onset of disability on November 3, 2005, the plaintiff was working as a substitute cafeteria worker, was doing well on her medications and not experiencing any joint pain;
- in July 2006, the plaintiff denied any joint pain, muscle soreness or focal weakness;
- on July 25, 2006, plaintiff's persantine myocardial perfusion scan was normal and she had normal left ventricular systolic function with a left ventricular ejection fraction of 64% and no electrocardiograph evidence or symptoms of ischemia.
- on July 27, 2006, plaintiff had full power in her upper and lower extremities during an examination of her heart condition.
- in September 5, 2006, Dr. Lomeo said the plaintiff was "feeling "better";
- in November 2006, plaintiff reported that her back pain was "better";
- in May and July 2007, Dr. Lomeo reported that plaintiff was "doing better" after being prescribed Imuran.
- In October, 2007, plaintiff's cardiologist concluded that plaintiff's condition was essentially unchanged from previous echocardiograms.

As the medical entries set forth in fn. 5, *supra*, reflect, these entries tell only part of the story and in fact relate, in some instances, to events that occurred within the context of very serious medical complications experienced by the plaintiff, including an emergency hospitalization on July 27, 2006.

the economy that plaintiff's RFC would allow her to perform.[15] For whatever reason, the Commissioner chose not to present any evidence of such available employment and the record is devoid of any information or evidence that would establish the availability of any such jobs. The plaintiff's DIB cannot be denied on that basis.[16]

In social security appeals, a district court has statutory authority to reverse an administrative decision or remand the case for further proceedings. 42 U.S.C. § 405(g); *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987); *Vitkek v. Finch*, 438 F.2d 1157, 1157-58 (4th Cir. 1971) (where ALJ's determination is in clear disregard of the overwhelming weight of the evidence, a court can modify or reverse the ALJ's decision with or without remanding the case for rehearing). *See also Breeden v. Weinburger*, 493 F.2d 1002, 1011-12 (4th Cir. 1974) (stating that reversal is appropriate "where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard" and "when reopening the record for more evidence would serve

---

[15] Once the plaintiff established, as she did, that she was unable to return to her past relevant work, the burden then shifted to the Commissioner to show that other jobs exist in the national economy that plaintiff can perform in order to deny her DIB. 20 C.F.R. § 404.1566; *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

[16] The Commissioner may meet his burden by relying on the Medical-Vocational Guidelines (Grids) or by calling a vocational expert to testify. *See* 20 C.F.R. 404.1566; *Aistrop v. Barnhart*, 36 F. App'x. 145, 146 (4th Cir. 2002). Specifically, the Commissioner may rely solely on the Grids to satisfy his burden of proof, if the claimant has no nonexertional impairments. *See Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987). However, when a plaintiff suffers from both exertional and nonexertional limitations, such as fatigue, the Grids tables serve only as guidelines and are not conclusive. *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). In such cases, where the use of a Grid alone will not satisfy the Commissioner's burden , the Commissioner may meet his burden by calling an expert vocational to prove that despite claimant's exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy. *Id.* at 50. The Commissioner decides whether to use a vocational expert or other specialist to help him meet his burden. 20 C.F.R. § 404.1566(e). Here, the Commissioner neither submitted expert testimony nor relied on any Grids.

no useful purpose.") Based on the entire record, the Court concludes that the decision of the Commissioner should be reversed, with no further proceedings other than an award to the plaintiff of DIB. The process to date has been a long one and the Commissioner had ample opportunity to create the record it wished and the judgment of this Court, at this point in the process, should be based on the record as it currently exists.

## V. CONCLUSION

Based on the record before the Court, this Court finds that it has jurisdiction to review the final decision of the Commissioner denying the plaintiff disability insurance benefits, there are no genuine issues of material fact, and plaintiff is entitled to judgment as a matter of law. Accordingly, for the above stated reasons, Plaintiff Dorothy Windsor's Motion for Summary Judgment is granted, Defendant's Motion for Summary Judgment is denied; the final decision of the Commissioner is reversed and the case is remanded to the Commissioner for an award of disability insurance benefits for the period of disability beginning on November 3, 2005.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
December 21, 2010